UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| AUSTIN NICHOLS,<br><br>    Plaintiff,<br><br>V.<br><br>BOURBON COUNTY SHERIFF'S DEPT., et al.,<br><br>    Defendants. | CIVIL ACTION NO. 5:13-119-KKC<br><br>**OPINION AND ORDER** |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on Defendants' motion for summary judgment. For the reasons stated below, the motion will be granted.

I.  **BACKGROUND**

On March 8, 2012, Plaintiff Austin Nichols ("Nichols") was an eighteen-year-old sophomore at Bourbon County High School when he was arrested for disorderly conduct, resisting arrest and assault by Deputy Sheriff and School Safety Officer Clinton Graves ("Graves"). Nichols filed this 42 U.S.C. § 1983 action alleging that Graves used excessive force in effectuating his arrest and that Graves was not adequately trained or supervised. Nichols also made claims for state-law assault and battery. Second Amended Complaint, DE 1-1, CM/ECF pp. 4-10.

Most of the facts leading up to the critical seconds of the confrontation between Graves and Nichols are not disputed. Deputy Graves received a phone call from Teresa Cloyd, the mother of Brittney Cloyd, Nichols' girlfriend, saying the two were fighting in a stairwell at the school and Brittney Cloyd was crying. Graves Dep. p. 42. Nichols admits that he and Cloyd were in the stairwell discussing their recent breakup and that Cloyd was visibly upset and left the building as Graves approached them. DE 25 at 1-2, 5. Nichols admits that Graves ordered

him to the school office and Graves then followed Cloyd outside the building.[1] *Id.* About twenty-five seconds after entering the office, Nichols left and went to the front door where Graves and Cloyd were entering. *Id.* at 30-31. Nichols approached Cloyd, but Graves placed himself between them. Nichols testified that Graves put his hand on Nichols' chest and pushed him toward the office. *Id.* at 30. Nichols said that Graves pulled him away from the office door; that Nichols did not push off the wall and did not "offer any resistance to Deputy Graves at that point," but that Graves put him in a headlock. *Id.* at 34. Nichols admitted that Graves never hit him with his hands, never punched him, never kicked him, and did not use any weapons on him. *Id.* at 39.

The record includes two videotapes from two surveillance cameras in the lobby near the office. DE 20-4. The video from the camera located to the left of the office and closest to the stairwell and outside door is labeled 20120308-110700.avi. The video from the camera located to the right of the office and away from the outside door is labeled 3-8-2012 11-07-00 AM.avi. *Id.* After reviewing both videos several times, Nichols admits that "the video accurately depict[s] the force that Deputy Graves used on you on March 8, 2012." Nichols Dep. at 39. He acknowledged that there is "not something that happened either in the stairwell before or once you're off the screen here that you're alleging is at issue in your complaint in terms of excessive force or assault." *Id.* at 26.

The critical incident between Nichols and Graves is found at approximately 11:09:40 on the videotape. Nichols description is that Graves "pulls me away from the office door." He testified regarding this incident as follows:

Q. Did you ever push off the wall?

A. No.

---

[1] Nichols testified at one point that he just stayed in the hallway, but he later admitted that Deputy Graves "possibly" asked him to go to the office. DE 20-2 at 20, 29. In any event, Nichols walked across the lobby and entered the office. *Id.* at 29-30.

> Q. Did you ever offer any resistance to Deputy Graves at that point when you were up against the wall?
>
> A. No.
>
> Q. It is your testimony, then, that he simply pulled you back and put you on the ground then without anything happening on your part?
>
> A. Right. That's why I held onto the door.
>
> Q. Do you remember any conversation up to this point?
>
> A. No.

Nichols Dep. p. 34.

Nichols pled guilty to charges of disorderly conduct and resisting arrest and understood that by pleading guilty, he agreed he had committed those offenses. *Id.* at 40-42. Following the incident, Nichols gave a handwritten note to Graves that said:

> I am truly sorry for my actions on Thursday, March 8th. I know that you only did what you had to do because of the bad decision I chose to make. I know that I can be better, and like you said, we have two more years together, and I will do everything I can to be a better person. I do not want to be someone you'll look down on, and I'd like to try to earn back your respect.
>                                             Sincerely, Austin Nichols

*Id.* at 88; DE 20-5.

Nichols argues in his responsive brief, "[t]he only facts in dispute was [sic] whether Defendant Graves initiated the contact with the Plaintiff or whether the Plaintiff initiated the contact with the Defendant, and whether or not Graves['] conduct was excessive." DE 25 at 5-6. The brief continues: "Considered in the light most favorable to the Plaintiff, the evidence in the case demonstrates an unrestrained, malicious attack on a juvenile by Defendant Graves." *Id.* at 6. "Plaintiff's only conduct was standing outside the office door until he was attacked by Defendant Graves. The Plaintiff's conduct simply does not rise to the level warranting the tackling of the Plaintiff to the ground and choking him." *Id.* at 8.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In other words, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. Summary judgment is appropriate where the plaintiff's evidence is merely colorable or not significantly probative. *Anderson*, 477 U.S. at 249-50.

In the present case, there is an exception to the requirement that all facts and inferences must be viewed in the light most favorable to the nonmoving party. In *Scott v. Harris*, 550 U.S. 372 (2007), the court said:

> There is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question. There are no allegations or indications that this videotape was doctored or altered in any way, nor any

4

> contention that what it depicts differs from what actually happened. The videotape quite clearly contradicts the version of the story told by [plaintiff]....

*Id.* at 378. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

    **B.**    **Qualified Immunity For Deputy Graves In His Individual Capacity**

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." "[D]etermining the objective reasonableness of a particular seizure under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake.' The inquiry requires analyzing the totality of the circumstances." The question is analyzed "from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' We thus 'allo[w] for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'" *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2020 (2014) (citations omitted).

In *Plumhoff*, the officers were involved in a high-speed chase that threatened the lives of innocent bystanders. Although Rickard's car collided with a police car and temporarily came to a near standstill, Rickard began maneuvering in an attempt to escape. The court held that the firing of fifteen shots, which killed Rickard and his passenger, did not violate the Fourth Amendment and, thus, was not excessive force. *Id.* at 2021-22. Even if the officers had violated the Fourth Amendment, the court held they would still be entitled to summary judgment based on qualified immunity. *Id.* at 2023.

*Scott v. Harris*, 550 U.S. 372 (2007), also involved a high-speed chase, which Deputy Scott ended by pushing the rear bumper of the fleeing vehicle, causing Harris to lose control

5

and crash down an embankment. Harris was rendered a quadriplegic. *Id.* at 375. Harris argued there was little threat to pedestrians or other motorists and that the officer's conduct constituted excessive force. "The videotape tells quite a different story," according to the court. *Id.* at 379. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 380. The court concluded that "[r]espondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." *Id.* at 380-81. The Supreme Court held "it is quite clear that Deputy Scott did not violate the Fourth Amendment." *Id.* at 381.

The totality of the circumstances in the present case begin with the videotape showing multiple students and administrative staff walking through various doors and across the high school lobby area throughout the video. Graves leaves his office, talking on a radio, and enters the stairwell. Tape 20120308-110700 at 11:08:12. Nichols leaves the stairwell and goes to the office. 11:08:34. Nichols soon leaves the office and walks to the outside door. 11:09:11. Just at the door, he confronts Graves and Cloyd who are coming inside. 11:09:21. Graves points toward the office and puts himself between Nichols and Cloyd. 11:09:26. Graves places his hand on Nichols chest and moves him toward the office. 11:09:29. When almost at the office door, Graves pushes Nichols against the wall to begin a pat down. 11:09:38. Nichols rears back against Graves, and Graves quickly takes him to the ground. 11:09:40. In something like a wrestling position, Graves faces Nichols and leans over his back with arms around Nichols' chest while Nichols continues to resist and fight until after he is handcuffed by the Principal and another person. 11:09:44 – 11:11:34. Meanwhile, students, including Cloyd, and staff are in the area.

The totality of the circumstances also include Deputy Graves knowledge that Nichols' mother had complained to Graves about domestic issues between her son and Cloyd and that

6

Nichols was using drugs, drinking alcohol, and running with the wrong people. Cloyd's mother also voiced concerns to Graves. Administrators of the high school had been dealing with Nichols and Cloyd in domestic-related issues. Graves Dep. at 22, 24, 27-28. Graves has known Nichols' father for several years, and he frequently mentioned concerns about his son. *Id.* at 25. Graves was also aware of an incident at the vocational school where Nichols "sprayed brake cleaner into the eyes of another student." *Id.* at 31. On the morning of March 8, 2012, Graves received a call from Teresa Cloyd that Nichols and Brittney Cloyd were fighting in a school stairwell and Brittney was crying. *Id.* at 42.

The government interests at stake here were the safety and security of the high school students and personnel. Graves Dep. at 15. There were a number of innocent people entering and leaving the lobby area. Nichols was arguing with his girlfriend, cursing Graves and refusing to obey Graves' commands to go to the office. *Id.* at 55-56. Because of Nichols' disorderly behavior and the risk to the safety of Cloyd, Graves and others, Graves told Nichols that he was under arrest. *Id.* at 57. Yet, Nichols continued to resist Graves.

All Nichols had to do was go into the office and stay there to end the entire confrontation. Alternatively, he could have submitted to the order that he was under arrest. After all, it was Nichols who started the confrontation with Graves and continued to escalate it. Instead of obeying orders, Nichols pushed Graves out of the way in an attempt to escape. The intrusion on Nichols' Fourth Amendment interests involved merely holding him near the ground until he could be handcuffed and cease being a risk to the safety of innocent bystanders.

While the safety and security risks in the present case were less than in *Scott* and *Plumhoff*, the force Graves used was orders of magnitude less. Nichols was simply restrained until he could be handcuffed, ending the risk of danger to others. The video demonstrates that the precipitating conduct was Nichols' disorderly conduct and resistance of arrest, charges to which he pled guilty. The video refutes Nichols' testimony that he did not provoke Graves' reaction. Without question, Deputy Graves did not violate Nichols' Fourth Amendment rights.

7

For a plaintiff to succeed on an individual capacity claim under § 1983, he must overcome the defense of qualified immunity shielding government officials from personal liability for damages unless their conduct violates a clearly established constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Nichols has failed to meet his burden of demonstrating that Graves is not entitled to qualified immunity. *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 605 (6th Cir. 2006). Deputy Graves is entitled to summary judgment.

### C. Qualified Immunity For Sheriff Matthews In His Individual Capacity

Nichols alleges that Sheriff Matthews failed to properly train and supervise Deputy Graves, thereby causing a violation of Nichols' constitutional rights. First, there was no violation of Nichols' constitutional rights. Second, "[a] supervisor is not liable under § 1983 for failing to train unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A plaintiff "must point to a specific action of each individual supervisor to defeat a qualified immunity claim." *Id.* Nichols does not point to any evidence to support a finding that Sheriff Matthews failed to train or supervise Deputy Graves.

To the contrary, the evidence is that Deputy Graves retired after twenty-years of service with the Kentucky State Police. Graves Dep. at 8. In addition to his training as a state trooper, Graves had over 250 hours of training specifically tailored to his position as a school resource officer. DE 20-6 at 3-4. Sheriff Matthews testified that he visited the Bourbon County High School two or three days a week and communicated with Deputy Graves by phone, radio and email. Matthews Dep. at 12-13. Nichols' unsupported allegations are refuted by the evidence. Sheriff Matthews is entitled to qualified immunity in his individual capacity.

### D. Official-Capacity Claims

To succeed on an official-capacity claim under § 1983, a plaintiff must establish that his constitutional violation resulted from an official policy or custom of the municipality. *Monell v. Dept. of Social Services*, 436 U.S. 658, 691 (1978). *See also Los Angeles County, California v.*

*Humphries*, 562 U.S. ___, 131 S. Ct. 447, 449 (2010) (Civil rights plaintiffs suing a municipal entity under 42 U.S.C. § 1983 must show that their injury was caused by a municipal policy or custom.). As discussed above, there was no constitutional violation of Nichols' rights. Accordingly, "the municipal defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001). Additionally, Nichols has failed to present any evidence of a policy or custom of Bourbon County to use excessive force to violate constitutional rights. The Defendants are entitled to summary judgment on these claims.

### E. State Law Claims

Nichols alleges that the force used in arresting him constituted assault, battery and negligence. Kentucky law provides public officials qualified official immunity from liability for "good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Qualified immunity applies when public officials perform (1) discretionary acts, (2) in good faith, and (3) within their scope of authority. *Id.* If the act was discretionary and within the scope of authority, the burden shifts to the plaintiff "to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Id.* at 523.

Kentucky law permits police officers to use reasonably necessary force to preserve order, including to make an arrest. KRS 503.090(1). Deputy Graves was entitled to use a reasonable amount of force to subdue and arrest Nichols for his disorderly conduct and even more force was warranted when he struggled and resisted arrest. The determination of the amount of force required to effect an arrest is a discretionary act and was within the scope of Graves' authority as a School Safety Officer. *Woosley v. City of Paris,* 591 F. Supp. 2d 913, 922 (E.D. Ky. 2008). The videotape refutes any argument that the discretionary act was performed in bad faith. Accordingly, summary judgment should be granted.

Nichols also alleged state law claims that Sheriff Matthews failed to properly train and supervise Graves. Supervision and training are discretionary functions. *Rowan County v.*

*Sloas*, 201 S.W.3d 469, 480 (Ky. 2006); *Doe v. Magoffin County Fiscal Court*, 174 F. App'x 962, 973 (6th Cir. 2006). Accordingly, Nichols must demonstrate that Sheriff Matthews acted in bad faith in training or supervising Graves. There is no evidence that Sheriff Matthews failed to train or supervise his deputies or that he acted in bad faith. Instead, the evidence is to the contrary. Sheriff Matthews is entitled to summary judgment on this claim.

Finally, Defendants are entitled to sovereign immunity to the extent that the state law claims are asserted against any Defendant in an official capacity or against the Bourbon County Sheriff's Department. A county government is cloaked with sovereign immunity under Kentucky law. *Comair, Inc. v. Lexington-Fayette Urban County Airport Corp.*, 295 S.W.3d 91, 94 (Ky. 2009). A county official has absolute immunity when sued in his official capacity. *Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008). Accordingly, the Defendants are entitled to sovereign immunity on these claims.

### III.    CONCLUSION

**IT IS ORDERED** that Defendants' motion for summary judgment on all claims [DE 20] is **GRANTED**. Judgment shall be entered contemporaneously with this Opinion and Order.

This June 12, 2014.

*[signature: Karen K. Caldwell]*

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY